**William HERRMANN, Appellant,**

v.

**Edwin MEESE, III, Attorney General, Robert Honsted, Warden.**

**No. 87–3555.**

United States Court of Appeals, Third Circuit.

Argued May 31, 1988.

Decided June 17, 1988.

Joel B. Johnston, Law Clerk (argued), George E. Schumacher, Federal Public Defender, Pittsburgh, Pa., for appellant.

Constance M. Bowden, Asst. U.S. Atty. (argued), J. Alan Johnson, U.S. Atty., W.D. Pennsylvania, Pittsburgh, Pa., for appellees.

Before SEITZ, SLOVITER, and HUTCHINSON, Circuit Judges.

**OPINION OF THE COURT**

SEITZ, Circuit Judge.

William Herrmann appeals the district court's order denying his petition for a writ of habeas corpus. 28 U.S.C. § 2241 (1982). We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253 (1982).

Herrmann was convicted in England of "possessing counterfeit [United States] currency with intent to pass or tender them as genuine or to deliver them to another with intent that he or another should pass or tender them as genuine." He was sentenced to eight years imprisonment. The United States subsequently requested the transfer of Herrmann to the United States pursuant to the European Convention on the Transfer of Sentenced Persons ("the Treaty") and to 18 U.S.C. §§ 4100–4115 (1982) ("the Transfer Statute") (relating to transfer of prisoners to or from foreign countries). Herrmann was transferred and is incarcerated at the federal prison at Loretto, Pennsylvania. He has served three years in connection with this offense.

Herrmann asserted in his habeas corpus complaint that his continued incarceration was in violation of the applicable provisions of the Treaty,[1] signed in 1983, which states in pertinent part:

ARTICLE 9

1. The competent authorities of the administering state shall:

[a] continue the enforcement of the sentence ...

---

1. Herrmann is contesting only the length of his incarceration, not the appropriateness of his transfer.

## ARTICLE 10

1. In the case of continued enforcement, the administering States *shall* be bound by the legal nature and duration of the sentence as determined by the sentencing State.

2. If, however, this sentence is by its nature or duration incompatible with the law of the administering State, ... that State *may* ... adapt the sanction to the punishment or measure prescribed by its own law for a similar offence. As to its nature, the punishment or measure shall, as far as possible, correspond with that imposed by the sentence to be enforced. It shall not aggravate, by its nature or duration, the sanction imposed in the sentencing States, nor exceed the maximum prescribed by the law of the administering State.

(emphasis added).

Herrmann argues that the eight-year sentence he received is sharply in contrast with the maximum sentence he could have received in the United States for the same type of criminal activity. He contends that the United States offense most similar to the one for which he was convicted in England is 18 U.S.C. § 480 (1982) (relating to possession of foreign counterfeit currency; one-year maximum sentence) rather than 18 U.S.C. § 472 (1982) (relating to possession of counterfeit United States currency; fifteen-year maximum sentence) as the government contends. Herrmann asserts that, in consequence, his sentence should have been adapted to a one-year term under Article 10.2 of the Treaty so as not to be incompatible with the law of the administering state. However, the language of Treaty Article 10.2, in contrast with the mandatory language of Treaty Article 10.1, is clearly permissive. It plainly gives the administering state the option to adapt sentences. Thus, Herrmann gets no comfort from the opening sentence of Article 10.2.

Herrmann next contends that the mandatory language of the last sentence of Treaty Article 10.2 requires that he be released. Herrmann argues that such language requires that his sentence be no greater than the maximum sentence in the United States of one year for the offense that he contends is most similar to the English offense.

Although Article 10.2 is arguably ambiguous because its first sentence is permissive and its last sentence is mandatory, the reading proffered by Herrmann is implausible in light of logic and the Explanatory Report. Herrmann must be asserting that the word "it" in the last sentence of article 10.2 refers to "the sentence" rather than "the adapted sentence." This interpretation, however, would render the last sentence senseless. To illustrate, a sentence cannot aggravate itself but an adapted sentence could aggravate the sentence of the sentencing court. Therefore, the word "it" must refer to the adapted sentence. Reading Article 10.2 as a whole, we conclude that the last sentence has effect *only if* the convict's sentence is adapted under the first sentence. Therefore, if the administering state chooses not to adapt the sentence, the second and third sentences of Treaty Article 10.2 have no effect.

Portions of the Explanatory Report on the Treaty shed light on our interpretation:

49. Where the administering state *opts* for the "continued enforcement" procedure, it is bound by the legal nature as well as the duration of the sentence as determined by the sentencing state

. . . .

50. If the two states concerned have different penal systems with regard to the division of penalties or the minimum and maximum lengths of sentence, it *might* be necessary for the administering state to adapt the sanction to the punishment or measure prescribed by its own law for a similar offence. Paragraph 2 *allows* that adaptation within certain limits: the adapted punishment or measure must, as far as possible, correspond with that imposed by the sentence to be enforced; it must not aggravate, by its nature or duration, the sanction imposed in the sentencing state; and it must not exceed the maximum prescribed by the law of the administering state. In other words: the administering state *may* adapt the sanction to the nearest equiva-

lent available under its own law, *provided that this does not result in more severe punishment or longer detention....* [T]he procedure under Article 10.2 enables the administering state merely to *adapt* the sanction prescribed by its own law in order to make the sentence enforceable. The administering state thus continues to enforce the sentence imposed in the sentencing state, but it does so in accordance with the requirements of its own penal system.

(emphasis added).

Thus, it can be seen that the quoted language supports our conclusion that Article 10.2 would only apply here if the government chose to adapt. But as the quoted provisions of the Transfer Statute show, the United States has opted not to adapt:

18 U.S.C. § 4105 (1982) provides in part: (a) Except as provided elsewhere in this section, an offender serving a sentence of imprisonment in a foreign country transferred to the custody of the Attorney General shall remain in the custody of the Attorney General under the same conditions and for the same period of time as an offender who had been committed to the custody of the Attorney General by a court of the United States for the period of time imposed by the sentencing court.

Herrmann argues that the Transfer Statute is inconsistent with the Treaty and that the Treaty controls as "last in time." This argument avails Herrmann nothing in light of our conclusion that the controlling language of Treaty Article 10.2 is permissive. Obviously, then, it cannot be inconsistent with the mandatory language of section 4105(a) of the Transfer Statute.[2]

Furthermore, the Transfer Statute is the appropriate statute governing transfers under the Treaty even though the statute was enacted before the Treaty was signed. There is nothing in the Transfer Statute to suggest that it was not intended to apply to treaties not yet in force. Indeed, the legis-

lative history indicates that the statute *was* intended to apply to future treaties. H.R. Rep. No. 95–720 at 1–2, 28, *reprinted in* 1977 U.S.Code Cong. & Admin.News at 3146–47, 3150.

The judgment of the district court will be affirmed.

---

**2.** We need not, therefore, determine which United States offense is most analogous to the offense for which Herrmann was convicted.

Additionally, in view of our disposition, we are not required to address the government's contention that the Treaty is not self-executing.